## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

MARC KELLMAN and DAVID KELLMAN,

    Plaintiffs,

v.

THE COCA-COLA COMPANY, a Delaware corporation,
COCA-COLA ENTERPRISES, INC., a Delaware corporation,
DETROIT RED WINGS, INC., a Michigan corporation,
and NHL ENTERPRISES, L.P., a Delaware corporation,
jointly and severally,

    Defendants.

Civil Action No. 03-71542

Hon. John Corbett O'Meara
Magistrate Judge Wallace Capel, Jr.

**DEMAND FOR JURY TRIAL**

---

| | |
|---|---|
| ANDREW J. MUNRO (P30304)<br>ANDREW M. ZACK (P27427)<br>MICHAEL D. KENNEDY (P55983)<br>MUNRO AND ZACK, P.C.<br>Attorneys for Plaintiffs<br>3250 West Big Beaver Road, Suite 520<br>Troy, Michigan 48084<br>248/643-9494 | GERALD E. MCGLYNN, III (P41149)<br>Bliss McGlynn, P.C.<br>Attorney for Detroit Red Wings, Inc.<br>2075 West Big Beaver Road, Suite 600<br>Troy, Michigan 48084<br>(248) 649-6090<br><br>DAVID M. HAYES (P14764)<br>CLARK HILL, P.L.C.<br>Attorney for N.H.L Enterprises, L.P.<br>500 Woodward Avenue, Suite 3500<br>Detroit, Michigan 48226-3435<br>(313) 965-8300 |

## FIRST AMENDED COMPLAINT

Plaintiffs, Marc Kellman and David Kellman, through their attorneys, MUNRO AND ZACK, P.C., file the following First Amended Complaint against Defendants, The Coca-Cola Company, Coca-Cola Enterprises, Inc., Detroit Red Wings, Inc., and NHL Enterprises, L.P., jointly and severally:

1



## General Allegations

1.  Plaintiffs, Marc Kellman and David Kellman (the "Kellmans"), are individuals residing, respectively, at 30829 Crest Forest, Farmington Hills, Michigan 48331, and 7050 Cedar Creek Drive, White Lake, Michigan 48383.

2.  Defendant, The Coca-Cola Company, is upon information and belief a Delaware corporation with its principal offices in Atlanta, Georgia, engaged in the business of marketing and selling soft drinks throughout the country, including Southeastern Michigan.

3.  Defendant, Coca-Cola Enterprises, Inc., is upon information and belief a Delaware corporation with its principal offices in Atlanta, Georgia, engaged in the business of marketing and selling soft drinks throughout the country, including Southeastern Michigan.

4.  Defendant, Detroit Red Wings, Inc. ("the Red Wings"), is upon information and belief a Michigan corporation with its principal offices in Detroit, Michigan and the corporation which operates the professional hockey team of the same name.

5.  Defendant, NHL Enterprises, L.P. ("NHLE"), is upon information and belief a Delaware limited partnership with its principal offices in New York City, engaged in the business of licensing and related oversight for the National Hockey League, including licensing and related oversight for the Red Wings.

6.  Jurisdiction is proper with this Court pursuant to 28 USC §§ 1331 and 1338.

7.  Venue is proper with this Court pursuant to 28 USC §§ 1391 and 1400.

## Factual Background

### The Wing Nut Hat, Patent, Copyright, and Trademark

8. On November 14, 1996, the Kellmans registered with the United States Copyright Office a work entitled "Wing Nut Sculpture" (the "Wing Nut Copyright"), bearing Registration No. VA 827-878. (The Wing Nut Copyright is attached as Exhibit A.)

9. On December 16, 1997, the Kellmans received a patent from the United States Commissioner of Patents and Trademarks for a foam sculptured novelty hat in the shape of a wing nut (the "Wing Nut Hat"), bearing Patent No. Des. 387,541 (the "Wing Nut Patent"). (The Wing Nut Patent is attached as Exhibit B.)

10. During this same time period, the Kellmans applied for a trademark with the United States Commissioner of Patents and Trademarks bearing Serial Nos. 75/178,835 and 75/361,267 in order to register the word phrases and marks, "Wing Nut" and "Wing-Nut," for a variety of merchandise and related goods (the "Wing Nut Trademark").

11. At all relevant, the Red Wings have owned trademark registrations on the Principal Register of the United States Patent and Trademark Office for "Red Wings" and "Detroit Red Wings" for a variety of merchandise, goods, and services.

12. After the Kellmans had applied for the Wing Nut Trademark, the Red Wings filed opposition proceedings in the United States Patent and Trademark Office (Opposition Nos. 110,660 and 112,463), objecting to the Kellmans' request for the Wing Nut Trademark.

### The Settlement Agreement

13. Prior to any resolution of the matter of the opposition proceedings in the United States

3

Patent and Trademark Office, the Kellmans and the Red Wings, along with NHL Enterprises, L.P., IBM Corporation, and Oglivy & Mather, entered into a Settlement Agreement ("the Settlement Agreement"). The Kellmans signed the Settlement Agreement on May 9, 2000. (The Settlement Agreement is attached as Exhibit C.)

14. Under the terms of the Settlement Agreement, the Red Wings agreed to withdraw and dismiss the opposition proceedings in the United States Patent and Trademark Office regarding the Wing Nut Trademark.

15. The Kellmans, in turn, agreed to assign the Wing Nut Trademark to the Red Wings, thereby entitling the Red Wings to use the word phrases and marks, "Wing Nut" and "Wing-Nut". (The May 9, 2000 Assignment of the Wing Nut Trademark is attached as Exhibit D.)

16. Under the terms of the Settlement Agreement, the Kellmans retained all rights to the three dimensional sculpture and derivative works covered by their Wing Nut Copyright and Wing Nut Patent, subject to the Red Wing's exclusive right to sell them. The only right conferred to the Red Wings in the Settlement Agreement to reproduce, display or otherwise use a depiction of the Wing Nut hat was for the sole purpose of advertising the Wing Nut hats for sale. At all times pertinent herein, the Red Wings never advertised the Wing Nut hats for sale.

## Wing Nut Hats

17. As part of the Settlement Agreement, the Red Wings retained the sole right to choose a manufacturer for the Wing Nut Hats (the "Manufacturer") and agreed to purchase Wing Nut Hats from the Manufacturer for a period of approximately 26 months.

18. The Kellmans, in turn, were to receive a licensee fee from the Manufacturer pursuant

4

to their own independent agreement with the Manufacturer.

19. The Red Wings and the Kellmans agreed to cooperate in the identification and arrangement of sales of the Wing Nut Hats in Joe Louis Arena, Red Wings-owned stores, and outside vendors.

20. The Kellmans further agreed in the Settlement Agreement to refrain from selling any Wing Nut Hats without the Red Wings' prior written approval.

21. Upon information and belief, from the effective date of the Settlement Agreement to the present, the Red Wings did not obtain a manufacturer and relied upon the Kellmans to manufacture and deliver Wing Nut hats for sale at Joe Louis Arena and Red Wings' Hockeytown retail stores. The Kellmans did so and had Wing Nut hats manufactured and delivered exclusively to the Red Wings. In 2001 the Red Wings ceased ordering Wing Nut hats even though, based upon information and belief, demand for the novelty hats remained high.

22. As a result of the cessation of the Red Wings' orders of Wing Nut hats, the Kellmans have not received any further income from the manufacturing, marketing, and sale of the Wing Nut Hats.

23. Based upon information and belief, the Red Wings have reproduced, displayed and otherwise used depictions of the Wing Nut hat, other than for advertising the Wing Nut hats for sale. The Red Wings have marketed and sold for commercial purposes at Joe Louis Arena and the Red Wings' Hockeytown retail stores T-shirts with a design that is an exact reproduction of, and/or substantially similar to, the Kellmans' copyrighted Wing Nut Sculpture. (See Exhibit F, which consists of reproductions of T-Shirts sold by the Red Wings.) The reproduction of the Wing Nut

5

Sculpture in the T-shirts was done without the consent or permission of the Kellmans and unlawfully violates the Settlement Agreement and the Kellmans' patent and copyright rights in the Wing Nut Patent and Copyright.

## Wing Nut Merchandise

24. The Red Wings agreed in the Settlement Agreement to "make a good faith effort to produce and license the right to sell merchandise," other than the Wing Nut Hats, bearing the Wing Nut Trademark (the "Wing Nut Merchandise"). The Red Wings agreed to do so for the 2001-02, 2002-03, and 2003-04 hockey seasons in an area within 75 miles of Joe Louis Arena.

25. As part of the Red Wings' agreement regarding the Wing Nut Merchandise, the Kellmans were to receive a royalty payment of 1% of "Retail Sales" (a term defined in the Settlement Agreement) from the Red Wings and a royalty payment of 2% of "Net Sales" (also defined in the Settlement Agreement) from NHLE.

26. Upon information and belief, from the effective date of the Settlement Agreement to the present, the Red Wings have never used or exerted any effort or established any procedures for the manufacturing, marketing, and sale of Wing Nut Merchandise.

27. As a result, the Kellmans have never received any royalty or licensing income from the manufacturing, marketing, and sale of Wing Nut Merchandise from the Red Wings or NHLE.

28. Moreover, from the effective date of the Settlement Agreement to the present, neither the Red Wings nor NHLE has ever accounted to the Kellmans regarding the manufacturing, marketing, and sale of Wing Nut Merchandise.

6

## Coca-Cola's Wing-Nuts Campaign

29. In late 2002 and early 2003, Defendants, The Coca-Cola Company and/or Coca-Cola Enterprises, Inc.(collectively "Coca-Cola"), marketed and sold Coca-Cola soda pop, upon which the words, "Be a Wing-Nut!," appeared on the label of its products and the term, "Wing-Nuts," appeared on the cap of the products ("Coca-Cola's Wing-Nuts Campaign").

30. An exact reproduction of the Kellmans' Wing Nut Sculpture also appeared on the cap of the products involved in Coca-Cola's Wing-Nuts Campaign (the "Wing Nut Bottlecap"). (A photograph of the Wing Nut Bottlecap is attached as Exhibit E.)

31. Upon information and belief, an advertising agency, whose identity is not currently known to the Kellmans, originated and orchestrated Coca-Cola's Wing-Nuts Campaign on behalf of Coca-Cola. When Plaintiffs learned the identity of this advertising agency, they will seek to leave to amend this Complaint to add the agency as an additional party Defendant.

32. The reproduction of the Wing Nut Sculpture in Coca-Cola's Wing-Nuts Campaign in the form of the Wing Nut Bottlecap was done without the consent or permission of the Kellmans and unlawfully violates the Settlement Agreement and the Kellmans' patent and copyright rights in the Wing Nut Patent and Wing Nut Copyright.

33. Upon information and belief, Coca-Cola's reproduction of the Wing Nut Sculpture in its Wing-Nuts Campaign in the form of the Wing Nut Bottlecap was done with the knowledge, consent, and contribution of the Red Wings.

7

## COUNT I

### DIRECT COPYRIGHT INFRINGEMENT –
### THE COCA-COLA COMPANY AND COCA-COLA ENTERPRISES

34. The Kellmans reallege and incorporate by reference Paragraphs 1 through 33.

35. The Kellmans own a valid copyright, the Wing Nut Copyright, registered with the United States Copyright Office on November 14, 1996.

36. The Wing Nut Copyright protects the Kellmans' three-dimensional "Wing Nut Sculpture."

37. As part of the Coca-Cola's Wing Nuts Campaign, Coca-Cola marketed and sold Coca-Cola products for commercial purposes containing the Wing Nut Bottlecap, which is an exact reproduction of, substantially similar to and/or a substantial appropriation of, the Kellmans' copyrighted Wing Nut Sculpture.

38. When it sold products containing the Wing Nut Bottlecap, Coca-Cola did not have the permission or consent of the Kellmans.

39. As a direct and proximate result of Coca-Cola's willful, direct infringement of the Kellmans' Wing Nut Copyright, the Kellmans have been damaged.

## COUNT II

### CONTRIBUTORY COPYRIGHT INFRINGEMENT –
### THE DETROIT RED WINGS

40. The Kellmans reallege and incorporate by reference Paragraphs 1 through 39.

41. The Kellmans own a valid copyright, the Wing Nut Copyright, registered with the United States Copyright Office on November 14, 1996.

42. The Wing Nut Copyright protects the Kellmans' three-dimensional "Wing Nut Sculpture."

43. As part of the Coca-Cola's Wing Nuts Campaign, Coca-Cola marketed and sold Coca-Cola products for commercial purposes containing the Wing Nut Bottlecap, which is an exact reproduction of, substantially similar to and/or a substantial appropriation of, the Kellmans' copyrighted Wing Nut Sculpture.

44. When it sold products containing the Wing Nut Bottlecap, Coca-Cola did not have the permission or consent of the Kellmans.

45. The Red Wings had actual knowledge of the Kellmans' Wing Nut Copyright.

46. Upon information and belief, the as-of-yet undetermined advertising agency, which originated and orchestrated Coca-Cola's Wing-Nuts Campaign on behalf of Coca-Cola, had actual or constructive knowledge of the Kellmans' Wing Nut Copyright.

47. The Red Wings and the as-of-yet undetermined advertising agency induced, caused, and/or materially contributed to Coca-Cola's wilful, direct infringement of the Kellmans' Wing Nut Copyright.

48. As a direct and proximate result of the Red Wings' and the as-of-yet undetermined advertising agency's contributory infringement of the Kellmans' Wing Nut Copyright, the Kellmans have been damaged.

## COUNT III

### DIRECT PATENT INFRINGEMENT –
### THE COCA-COLA COMPANY AND COCA-COLA ENTERPRISES

49. The Kellmans reallege and incorporate by reference Paragraphs 1 through 48.

50. The Kellmans own a valid patent, the Wing Nut Patent, approved by the United States Commissioner of Patents and Trademarks on December 16, 1997.

51. The Wing Nut Patent protects the Kellmans' ornamental design of the Wing Nut Hat.

52. As part of the Coca-Cola's Wing Nuts Campaign, Coca-Cola marketed and sold Coca-Cola products for commercial purposes containing the Wing Nut Bottlecap, which is an exact reproduction of, substantially similar to and/or a substantial appropriation of, the Kellmans' patented Wing Nut Sculpture.

53. When it sold products containing the Wing Nut Bottlecap, Coca-Cola did not have the permission or consent of the Kellmans.

54. As a direct and proximate result of Coca-Cola's willful, direct infringement of the Kellmans' Wing Nut Patent, the Kellmans have been damaged.

## COUNT IV

### INDUCEMENT OF PATENT INFRINGEMENT – THE DETROIT RED WINGS

55. The Kellmans reallege and incorporate by reference Paragraphs 1 through 54.

56. The Kellmans own a valid patent, the Wing Nut Patent, approved by the United States Commissioner of Patents and Trademarks on December 16, 1997.

57. The Wing Nut Patent protects the Kellmans' ornamental design of the Wing Nut Hat.

58. As part of the Coca-Cola's Wing Nuts Campaign, Coca-Cola marketed and sold its products for commercial purposes containing the Wing Nut Bottlecap, which is an exact reproduction of, substantially similar to, and/or a substantial appropriation of, the Kellmans' patented Wing Nut Sculpture.

59. When it sold products containing the Wing Nut Bottlecap, Coca-Cola did not have the permission or consent of the Kellmans.

60. The Red Wings had actual knowledge of the Kellmans' Wing Nut Patent.

61. Upon information and belief, the as-of-yet undetermined advertising agency had actual or constructive knowledge of the Kellmans' Wing Nut Patent.

62. The Red Wings and the as-of-yet undetermined advertising agency induced and/or caused Coca-Cola to directly infringe on the Kellmans' Wing Nut Patent.

63. As a direct and proximate result of the Red Wings' and the as-of-yet undetermined advertising agency's inducement of Coca-Cola's infringement of the Kellmans' Wing Nut Patent, the Kellmans have been damaged.

## COUNT V

### CONTRIBUTORY PATENT INFRINGEMENT – THE DETROIT RED WINGS

64. The Kellmans reallege and incorporate by reference Paragraphs 1 through 63.

65. The Kellmans own a valid patent, the Wing Nut Patent, approved by the United States Commissioner of Patents and Trademarks on December 16, 1997.

66. The Wing Nut Patent protects the Kellmans' ornamental design of the Wing Nut Hat.

67. As part of the Coca-Cola's Wing Nuts Campaign, Coca-Cola marketed and sold its products for commercial purposes containing the Wing Nut Bottlecap, which is an exact reproduction of, substantially similar to, and/or a substantial appropriation of, the Kellmans' patented Wing Nut Sculpture.

68. When it sold products containing the Wing Nut Bottlecap, Coca-Cola did not have

11

the permission or consent of the Kellmans.

69. The Red Wings had actual knowledge of the Kellmans' Wing Nut Patent.

70. Upon information and belief, the as-of-yet undetermined advertising agency had actual or constructive knowledge of the Kellmans' Wing Nut Patent.

71. The Red Wings and the as-of-yet undetermined advertising agency materially contributed to Coca-Cola's direct infringement on the Kellmans' Wing Nut Patent.

72. As a direct and proximate result of the Red Wings' and the as-of-yet undetermined advertising agency's contributory infringement of the Kellmans' Wing Nut Patent, the Kellmans have been damaged.

## COUNT VI

### DIRECT COPYRIGHT INFRINGEMENT – THE DETROIT RED WINGS

73. The Kellmans reallege and incorporate by reference Paragraphs 1 through 72.

74. The Kellmans own a valid copyright, the Wing Nut Copyright, registered with the United States Copyright Office on November 14, 1996.

75. The Wing Nut Copyright protects the Kellmans' three-dimensional "Wing Nut Sculpture."

76. Based upon information and belief, the Red Wings have marketed and sold for commercial purposes at Joe Louis Arena and the Red Wings' Hockeytown retail stores T-shirts with a design that is an exact reproduction of, substantially similar to and/or a substantial appropriation of, the Kellmans' copyrighted Wing Nut Sculpture.

77. When it sold T-shirts with a design that is an exact reproduction of, and/or

12

substantially similar to, the Kellmans' copyrighted Wing Nut Sculpture, the Red Wings did not have the permission or consent of the Kellmans.

78. As a direct and proximate result of the Red Wings' willful, direct infringement of the Kellmans' Wing Nut Copyright, the Kellmans have been damaged.

have been damaged.

## COUNT VII

### DIRECT PATENT INFRINGEMENT – THE DETROIT RED WINGS

79. The Kellmans reallege and incorporate by reference Paragraphs 1 through 78.

80. The Kellmans own a valid patent, the Wing Nut Patent, approved by the United States Commissioner of Patents and Trademarks on December 16, 1997.

81. The Wing Nut Patent protects the Kellmans' ornamental design of the Wing Nut Hat.

82. Based upon information and belief, the Red Wings have marketed and sold for commercial purposes at Joe Louis Arena and the Red Wings' Hockeytown retail stores T-shirts with a design that is an exact reproduction of, substantially similar to and/or a substantial appropriation of, the Kellmans' patented Wing Nut Sculpture.

83. When it sold T-shirts with a design that is an exact reproduction of, substantially similar to and/or a substantial appropriation of, the Kellmans' patented Wing Nut Sculpture, the Red Wings did not have the permission or consent of the Kellmans.

84. As a direct and proximate result of the Red Wings' willful, direct infringement of the Kellmans' Wing Nut Patent, the Kellmans have been damaged.

13

## COUNT VIII

## BREACH OF THE SETTLEMENT AGREEMENT –
## THE DETROIT RED WINGS

85. The Kellmans reallege and incorporate by reference Paragraphs 1 through 84.

86. As part of the Settlement Agreement, the Red Wings agreed to purchase Wing Nut Hats from the Manufacturer for a period of approximately 26 months.

87. The Kellmans, in turn, were to receive a licensee fee from the Manufacturer pursuant to their own independent agreement with the Manufacturer.

88. The Red Wings and the Kellmans agreed to cooperate in the identification and arrangement of sales of the Wing Nut Hats in Joe Louis Arena, Red Wings-owned stores, and outside vendors.

89. Upon information and belief, from the effective date of the Settlement Agreement to the present, the Red Wings have never used or exerted any effort or established any procedures for the manufacturing, marketing, and sale of the Wing Nut Hats.

90. As a result, the Kellmans have never received any licensing income from the manufacturing, marketing, and sale of the Wing Nut Hats.

91. Moreover, from the effective date of the Settlement Agreement to the present, the Red Wings have never accounted to the Kellmans regarding the manufacturing, marketing, and sale of the Wing Nut Hats.

92. Based upon information and belief, the Red Wings have reproduced, displayed and otherwise used depictions of the Wing Nut hat, other than for advertising the Wing Nut hats for sale. The Red Wings have marketed and sold for commercial purposes at Joe Louis Arena and the Red

14

Wings' Hockeytown retail stores T-shirts with a design that is an exact reproduction of, substantially similar to and/or a substantial appropriation of, the Kellmans' copyrighted Wing Nut Sculpture. The reproduction of the Wing Nut Sculpture in the T-shirts was done without the consent or permission of the Kellmans and unlawfully violates the Settlement Agreement and the Kellmans' patent and copyright rights in the Wing Nut Patent and Copyright.

93. As a direct, proximate, and foreseeable result of the Red Wings' conduct, and further breach of the duty of good faith and fair dealing, the Red Wings have materially breached the Settlement Agreement, causing the Kellmans' damages.

## COUNT IX

### BREACH OF THE SETTLEMENT AGREEMENT – THE DETROIT RED WINGS AND NHLE

94. The Kellmans reallege and incorporate by reference Paragraphs 1 through 93.

95. The Red Wings agreed in the Settlement Agreement to "make a good faith effort to produce and license" the Wing Nut Merchandise.

96. The Red Wings and NHLE agreed in the Settlement Agreement to pay the Kellmans a royalty payment of 1% of "Retail Sales" (a term defined in the Settlement Agreement) of the Wing Nut Merchandise from the Red Wings and a royalty payment of 2% of "Net Sales" (also defined in the Settlement Agreement) from NHLE.

97. Upon information and belief, from the effective date of the Settlement Agreement to the present, the Red Wings have never used or exerted any effort or established any procedures for the manufacturing, marketing, and sale of Wing Nut Merchandise.

98. As a result, the Kellmans have never received any royalty or licensing income from

15

the manufacturing, marketing, and sale of Wing Nut Merchandise from the Red Wings or NHLE.

99. Moreover, from the effective date of the Settlement Agreement to the present, neither the Red Wings nor NHLE has ever accounted to the Kellmans regarding the manufacturing, marketing, and sale of Wing Nut Merchandise.

100. As a direct, proximate, and foreseeable result of the Red Wings' and NHLE's conduct, and further breach of the duty of good faith and fair dealing, the Red Wings and NHLE have materially breached the Settlement Agreement, causing the Kellmans' damages.

## COUNT X

### FRAUDULENT INDUCEMENT – THE DETROIT RED WINGS

101. The Kellmans reallege and incorporate by reference Paragraphs 1 through 88.

102. In May 2000, the Red Wings, NHLE and the Kellmans entered into the Settlement Agreement described above.

103. Under the terms of the Settlement Agreement, the Red Wings agreed to withdraw and dismiss the opposition proceedings in the United States Patent and Trademark Office regarding the Wing Nut Trademark.

104. The Kellmans, in turn, agreed to assign the Wing Nut Trademark to the Red Wings.

105. The Red Wings made certain representations regarding the manufacture and sale of the Wing Nut Hats.

106. The parties contemplated that the Kellmans would receive the benefit of obtaining a licensee fee from the Manufacturer of the Wing Nut Hats pursuant to an independent agreement with the Manufacturer.

16

107. The Red Wings made further representations in the Settlement Agreement regarding the manufacture and sale of Wing Nut Merchandise.

108. Among the representations made by the Red Wings were that the Kellmans were to receive royalty and/or licensing income from the sale of Wing Nut Merchandise.

109. When the Red Wings made these representations, they were untrue at the time and known to be untrue or made recklessly without concern for the truth.

110. The Red Wings made these representations to the Kellmans in order to induce them into entering into the Settlement Agreement.

111. The Kellmans reasonably relied upon the Red Wings' representations in the Settlement Agreement.

112. Upon information and belief, from the effective date of the Settlement Agreement to the present, the Red Wings have never used or exerted any effort or established any procedures for the manufacturing, marketing, and sale of the Wing Nut Hats.

113. . As a result, the Kellmans have never received any licensing income from the manufacturing, marketing, and sale of the Wing Nut Hats from the Red Wings.

114. Upon information and belief, from the effective date of the Settlement Agreement to the present, the Red Wings have never used or exerted any effort or established any procedures for the manufacturing, marketing, and sale of Wing Nut Merchandise.

115. As a result, the Kellmans have never received any royalty or licensing income from the manufacturing, marketing, and sale of Wing Nut Merchandise from the Red Wings or NHLE.

116. In the Settlement Agreement, the Red Wings acknowledged and agreed that the

Kellmans retained the Wing Nut Copyright and Wing Nut Patent and did so to induce the Kellmans into executing the Settlement Agreement.

117. The Kellmans reasonably relied upon the Red Wings' representations regarding the Wing Nut Copyright and Wing Nut Patent.

118. In contravention of Defendant's acknowledgment and representations, the Red Wings, during the time that the Settlement Agreement was negotiated, or shortly thereafter, actively participated with Coca-Cola in the origination and development of Coca-Cola's Wing Nuts Campaign and marketed and sold for commercial purposes at Joe Louis Arena and the Red Wings' Hockeytown retail stores T-shirts with a design that is an exact reproduction of, substantially similar to and/or a substantial appropriation of, the Kellmans' copyrighted and patented Wing Nut Sculpture in order to undermine and interfere with the Kellmans' Wing Nut Copyright and Wing Nut Patent.

119. As a direct, proximate, and foreseeable result of the Red Wings' conduct and representations, the Kellmans have been damaged, including, but not limited to, entering into the Settlement Agreement as a result of the Red Wings' fraudulent inducement.

WHEREFORE, Plaintiffs, MARC KELLMAN and DAVID KELLMAN, respectfully request the Court grant the following relief against the Defendants, THE COCA-COLA COMPANY, COCA-COLA ENTERPRISES, INC., DETROIT RED WINGS, INC., and NHL ENTERPRISES, L.P., jointly and severally:

    A.    Judgment on Counts I - VIII of this Complaint;

    B.    Actual damages, additional profits of the Defendants/Infringers, statutory damages, and/or attorneys fees under 17 USC § 504;

    C.    Actual damages, additional profits of the Defendants/Infringers, statutory damages,

and/or attorneys fees under 35 USC § 271;

D. Lost profits, royalty, and licensing income from the manufacturing, marketing, and sale of Wing Nut Hats and Wing Nut Merchandise;

E. An equitable accounting of the manufacture, marketing, and sale of the Wing Nut Hats;

F. An equitable accounting of the manufacture, marketing, and sale of Wing Nut Merchandise;

G. Rescission of the Settlement Agreement;

H. Pre-judgment interest and other economic and consequential damages;

I. Expert fees and other costs that Plaintiffs have incurred or will incur;

J. Punitive and/or exemplary damages, if applicable;

K. Costs incurred in this action; and

L. All other relief the Court deems just and necessary.

**MUNRO AND ZACK, P.C.**

By: *[signature]*

ANDREW J. MUNRO (P30304)
ANDREW M. ZACK (P27427)
MICHAEL D. KENNEDY (P55983)
Attorneys for Plaintiffs

Dated: May 7, 2003

J:\W\Wing-Nut\Coca-Cola\amended complaint.wpd

19